UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>                     **Plaintiffs,**<br><br>    -against-<br><br>INFINITE SUPPLY GROUP INC., MIKAEL OSIASHVILI, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>                     **Defendants.** | CIVIL ACTION<br><br>24-CV-1860<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (hereinafter "**Plaintiffs**"), by their attorneys, Morrison Mahoney LLP, for their Complaint against Defendants Infinite Supply Group Inc. ("Infinite Supply"), Mikael Osiashvili ("Osiashvili") (Infinite Supply and Osiashvili are collectively referred to as "**Retail Defendants**"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1. From at least September 2021 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2. This action seeks to recover more than $45,000.00 that Defendants stole from Plaintiffs through the submission of hundreds of false and/or fraudulent insurance claims for pain management and post-surgical rehabilitative durable medical equipment ("DME") devices, in particular pneumatic and/or cold compression devices (hereinafter "Compression Devices") and Pain Shield portable ultrasound ("Portable Ultrasound") units (collectively "Rental DME"). As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes

by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools and compression devices; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes. Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.      At all relevant times mentioned herein, each and every piece of Rental DME supplied by Infinite Supply was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.      To execute the scheme to defraud alleged herein, Defendant Osiashvili, through the Infinite Supply, entered into separate arrangements with one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.      Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

> (i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME, including Rental DME, to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others;

(ii) fabricating and/or falsifying DME prescriptions by:

    (a) utilizing blank templated prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME; and/or

    (b) duplicating and/or photocopying the HCPs' signatures onto new prescription forms, which the Clinic would then fill in with expensive and unnecessary DME; and/or

(iii) ensuring that the prescriptions were provided directly to Infinite Supply to ensure that Infinite Supply could bill Plaintiffs to purportedly fill the prescription rather than allow the possibility that the Covered Person may fill the prescription at a DME retailer of their own choosing.

6.      The use of fraudulent templated prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME purportedly dispensed to the patient, if any items were legitimately prescribed and dispensed at all; (ii) misrepresent the medical necessity of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.      Pursuant to the fraudulent prescriptions, Infinite Supply routinely provided (or purported to provide) expensive pain management and/or post-operative rehabilitative Rental DME for the same and/or similar duration, to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.      On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.      In many instances, Osiashvili submitted to Plaintiffs, through Infinite Supply, prescription forms which they knew to be fabricated and/or fraudulently altered and/or duplicated,

in order to misrepresent the quality and medical necessity of Rental DME actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.     After obtaining the fraudulent prescriptions from the No-fault Clinics Osiashvili, through Infinite Supply, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the nature and quality of the items, the amounts they were entitled to be reimbursed and/or the medical necessity of the purportedly prescribed Rental DME.

11.     In carrying out the scheme to defraud, Defendants stole in excess of $45,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

### STATUTORY/REGULATORY SCHEME

12.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

13.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for Rental DME that were never provided, not provided as billed or, if provided, were otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar DME and/or orthotic devices.  Exhibit "1" in

the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs to Defendants for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

14.     Defendant Infinite Supply is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Infinite Supply accepted (and continues to accept) assignments of benefits from Covered Persons and submitted (and continues to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

15.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., Infinite Supply submitted (and continues to submit) its claims to Plaintiffs using the claim forms prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), including the "No-Fault Assignment of Benefits Form" or form "NF-AOB" and a bill in the form of the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form (such as the "Health Insurance Claim Form" or "CMS Form 1500").

16.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Infinite Supply were required to contain, in substance, the following:

> Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.

17.     At all relevant times mentioned herein, Infinite Supply identified the Rental DME it purported provided to Covered Persons on the claim forms using Healthcare Common Procedure

Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia* durable medical equipment and orthotic devices.

18.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

19.     At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service-related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

20.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

21.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible

6

reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

22.     At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

23.     Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. seq.*), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances.

24.     The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, in accordance with Medicaid rules, shall be the *lesser* of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

25.     Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter

the "Medicaid DME Fee Schedule"), 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021), which lists such devices by corresponding HCPCS Level II code.

26.     In view of the adoption by the WCB of the Medicaid DME Fee Schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Medicaid DME Fee Schedule that was, and is, in effect at all relevant times mentioned herein prior to April 4, 2022.

27.     Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided prior to April 4, 2022, providers of DME are entitled to reimbursement in the amounts set forth in the Medicaid DME Fee Schedule.  At all relevant times mentioned herein for DME and/or orthotic devices provided prior to April 4, 2022, for Non-Medicaid DME Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021) (sometimes referred to herein as the "Lesser of Standard").

28.     At all relevant times mentioned herein prior to April 4, 2022, under the Medicaid DME Fee Schedule, providers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."  12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

29.     Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

30.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Medicaid DME Fee Schedule and the Lesser of Standard remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard on April 4, 2022. New York Workers' Compensation    Board    Bulletin    No.    046-1408    (May    24,    2021) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp) and Bulletin No. 046-1496 (Feb. 3, 2022) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

31.     In relevant part, for DME and/or orthotic devices provided on or after April 4, 2022, the WCB established its own fee schedule for DME and orthotic devices to replace its prior adoption of the Medicaid DME Fee Schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances. (hereinafter "WCB DME Fee Schedule") *See* 12 N.Y.C.R.R. § 442.2(a) (WCB DME Fee Schedule and Medicaid DME Fee Schedule are collectively referred to as the "Fee Schedule").

32.     Like the Medicaid DME Fee Schedule, the WCB DME Fee Schedule listed DME and orthotic devices by their corresponding HCPCS Level II Codes.

33.     With respect to rental DME, at all relevant times mentioned herein on or after April 4, 2022, under the WCB DME Fee Schedule, providers of rental DME are limited to:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

34.     Except as rendered inapplicable to reimbursement of No-fault claims by Regulation 83, the WCB DME Fee Schedule applies to the reimbursement of items listed in the WCB DME Fee Schedule.

35.     Pursuant to Regulation 83, the requirements of prior authorization under the WCB DME Fee Schedule does not apply to the reimbursement of claims under the No-fault law.

36.     The Department of Financial Services recognized that the WCB's elimination of the Lesser of Standard for reimbursement of items not listed on the WCB DME Fee Schedule creates a system, in the context of reimbursement under the No-fault law, for fraud and abuse, with no cost-containment systems in place and the possibility for nefarious DME providers to bill for DME at exorbitant, unchecked rates.

37.    To address the potential for fraud and abuse, by emergency adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, the DFS reinstated the Lesser of Standard for reimbursement of DME under the No-fault law.

38.    By Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, DFS extended its reinstatement of the Lesser of Standard for reimbursement of DME under the No-fault law, in each instance, for an additional 90 days.

39.    DFS promulgated its final Adoption of the 36th Amendment to Regulation 83, including its reinstatement of the Lesser of Standard and clarification as it relates to rental items, effective February 15, 2023, which states as follows:

**Part E. Durable medical equipment fee schedule.**

(a) This Part shall apply to durable medical equipment not listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule and to durable medical equipment listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule for which no fee for purchase, rental, or both has been assigned.

(b) As used in this Part, acquisition cost means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax.

(c) The maximum permissible purchase charge for such durable medical equipment shall be the lesser of the:

   (1)    acquisition cost plus 50%; or

   (2)    usual and customary price charged by durable medical equipment providers to the general public.

(d) (1) On and after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental charges for less than one month shall be calculated on a pro-rata basis using a 30-day month.

   (2)    The total accumulated rental charge for such durable medical equipment shall be the least of the:

      (i)    acquisition cost plus 50%;

      (ii)    usual and customary price charged by durable medical equipment providers to the general public; or

       (iii)    purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

https://www.dfs.ny.gov/system/files/documents/2023/02/rf_ins_83_amend36_text.pdf.

40.    At all times relevant times mentioned herein from April 4, 2022 through the present, with respect to DME items that are not listed on the WCB DME Fee Schedule and/or listed on the WCB DME Fee Schedule but for which no fee has been assigned (hereinafter "Non-WCB DME Fee Schedule" items) (Non-WCB DME Fee Schedule items and Non-Medicaid DME Fee Schedule items are collectively referred to as "Non-Fee Schedule" items), the maximum permissible reimbursement shall be determined by application of the Lesser of Standard as reflected in the Emergency Adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, extended by Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, and thereafter in the Final Adoption of the 36th Amendment to Regulation 83, effective February 15, 2023. 11 N.Y.C.R.R, § App.17-C Part E.

41.    At all relevant times mentioned herein from April 4, 2022, through the present, a provider's acquisition cost is "the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax. 11 N.Y.C.R.R. § App.17-C Part E(b) (promulgated by April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022 Notices of Emergency Adoption, and Final Adoption effective February 15, 2023).

42.    At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

43.    Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the

"full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

44.    At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Osiashvili, through Infinite Supply, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the Rental DME provided, if provided at all, as well as the cost, quality, and medical necessity of the billed-for Rental DME. To the extent the Rental DME were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need, and was billed in an amount far in excess of what the Retail Defendants were entitled to be reimbursed.

45.    On information and belief, in furtherance of the scheme to defraud alleged herein, Infinite Supply as a matter of pattern, practice and protocol, routinely provided Covered Persons with expensive pain management and/or postoperative Rental DME that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

46.    As part of a fraudulent protocol of treatment, in addition receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools; back braces, cervical collars, knee braces, and/or shoulder braces, Infinite Supply, among others, delivered to the Covered Persons expensive pain management and/or rehabilitative rental DME, including Portable Ultrasound units, for up to 28 days or longer, that are not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration as part of the scheme to financially enrich Infinite Supply, through a fraudulent protocol of treatment, all while significantly

13

diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

47.     Thereafter, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medical necessary.  On the same day as the surgery, and within a few short days after the surgery, Infinite Supply, among others, delivers to the Covered Persons expensive rental DME and/or compression devices that are not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration.  In most cases, the Covered Persons receive up to four or more such medically unnecessary items from DME retailers, including one or more compression devices on the day of the surgery at the ASC for a single day's use, in addition to substantially similar compression devices and other postoperative rental DME for home-use, for up to 28 days or longer, in some cases exceeding $6,000.00 in a total cost for all of the perioperative and postoperative items, as part of the scheme to financially enrich the rental DME providers, and Infinite Supply in particular, through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

48.     On information and belief, Infinite Supply was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

49.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any Rental DME at all, provided Covered

Persons with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

50.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud—although that would be troubling enough—rather, they adopted fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing fraudulent prescriptions for Rental DME pursuant to a predetermined course of treatment, that misrepresented the nature, quality, cost, and medical necessity for the Rental DME purportedly provided, was carried out for the purpose of committing fraud.

51.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices. In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of Infinite Supply's No-fault claims because Osiashvili, through Infinite Supply, submitted (1) false and fraudulent insurance claims for medically unnecessary Rental DME to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiffs for Rental DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity. Such claims continue to be submitted by and/or in the name of Infinite Supply and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

15

52.     By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample in excess of $94,000.00 in unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.

## NATURE OF THE ACTION

53.     This action is brought pursuant to:

i)   The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)  New York State common law; and

iii) the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

54.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' scheme to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for Rental DME they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

55.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of Infinite Supply's unpaid No-fault claims because:

i)   The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and/or

ii)  The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for Rental DME that were provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

56.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $45,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for Rental DME that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

**A.     Plaintiffs**

57.     Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

58.     Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

59.     Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

60.     Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

61.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

62.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.** **The Individual Defendant**

63.   Mikael Osiashvili ("Osiashvili") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Defendant Infinite Supply, and, at all times relevant herein, operated, managed, and/or controlled its activities.

**C.** **The Retailer Defendant**

64.   Infinite Supply Group Inc. ("Infinite Supply") was formed on or about September 24, 2021, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 85-42 Woodhaven Boulevard, Woodhaven, New York 11421.  Infinite Supply is operated, managed, and/or controlled by Defendant Osiashvili and submitted fraudulent claims to Plaintiffs seeking reimbursement for Rental DME under the No-fault Law.

**D.** **The John Doe Defendants**

65.   On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**E.** **The ABC Corporations**

66.   On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

67.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

68.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

69.     This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

70.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

71.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

72.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

73.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

74.     Infinite Supply is ostensibly a DME supply companies that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Infinite Supply accepts assignments of benefits from Covered Persons covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

75.     To process and verify the claims submitted by Infinite Supply, Plaintiffs required, and Infinite Supply submitted, prescriptions and other documents relating to the Rental DME allegedly supplied to Covered Persons for which Infinite Supply was seeking reimbursement from Plaintiffs.

76.     In nearly all instances, the prescriptions submitted in support of Infinite Supply's claims for reimbursement were fraudulent, fabricated, duplicated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

77.     At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiffs in particular, Infinite Supply made the following representations to each recipient:

- The bill for Rental DME was based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;

- The prescription for Rental DME was not issued pursuant to any unlawful financial arrangements;

- The Rental DME identified on the bill was actually provided to the Covered person based on a valid prescription identifying medically necessary items;

- The billing code used on the bill actually represents the Rental and all included services that was provided to the Covered Person; and

- The fee sought for the billed for Rental DME did not exceed that permissible under the No-fault law and regulations.

78.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process Infinite Supply's claims within 30 days of receipt of proof of claim.

79.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Infinite Supply in support of its claims, and paid Infinite Supply based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

80.     At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

81.     At all relevant times mentioned herein, for DME and orthotic devices provided to Covered Persons prior to April 4, 2022, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2. (effective through June 7, 2021).

82.     At all relevant times mentioned herein prior to April 4, 2022, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Medicaid DME Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

(1) the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

(2) the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2. (effective through June 7, 2021).

83.     At all relevant times mentioned herein prior to April 4, 2022, the regulation provides that suppliers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."   12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

84.     Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

85.     On April 4, 2022, the WCB's amendments to the fee schedule by the WCB took effect, including the establishment of the WCB DME Fee Schedule.  As part of the WCB's establishment of the WCB DME Fee Schedule, the available DME on the Fee Schedule was updated, the reimbursement rates were increased, and a prior authorization process was established for certain DME in the WCB DME Fee Schedule for which no reimbursement rate is listed and/or for DME not listed in the WCB DME Fee Schedule.  As a result of these amendments, the WCB eliminated the prior Lesser of Standard that had existed for Non-Fee Schedule items.

86.     Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided on or after April 4, 2022, the Worker's Compensation Board has adopted its own

fee schedule for DME and orthotic devices to replace its prior adoption of the fee schedule set by the New York State Medicaid Program. 12 N.Y.C.R.R. § 442.2. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

87.    At all times mentioned herein on or after April 4, 2022, for WCB DME Fee Schedule rental DME, the fee payable shall be:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

88.    In view of the WCB's elimination of the Lesser of Standard, resulting in the absence of a cost control measure for Non-WCB DME Fee Schedule items and the potential for exorbitant prices and unlimited rental charges that could far exceed the purchase price of the DME, the DFS Superintendent deemed it necessary to adopt an emergency amendment to 11 N.Y.C.R.R. § 68 (Regulation 83) to cap the purchase and total accumulated rental prices for Non-WCB Fee Schedule items.

89.    Accordingly, at all relevant times mentioned herein on or after April 4, 2022, for Non-WCB Fee Schedule DME, the fee payable shall be: [t]he maximum permissible purchase charge or the total accumulated rental charge for such durable medical equipment shall be the lesser of the: (1) acquisition cost plus 50%; or (2) usual and customary price charged by durable medical equipment providers to the general public. 11 N.Y.C.R.R. § App.17-C Part E(c) (promulgated by April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022

Notices of Emergency Adoption); *accord* 11 N.Y.C.R.R. § App.17-C Part E(c), (d)(2). (Final Adoption effective February 15, 2023).  Moreover, at all relevant times mentioned herein on or after June 1, 2023, for the rental of DME either not listed on the WCB Fee Schedule, or listed without a maximum permissible rental charge, the "maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental Charges for less than one month shall be calculated on a pro-rata basis using a 30-day month." 11 N.Y.C.R.R. § App.17-C Part E(d)(1) (Final Adoption effective February 15, 2023). As used in the regulation, "*acquisition cost* means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax." 11 N.Y.C.R.R. § App.17-C Part E (b) (promulgated by Notices of Emergency Adoption issued April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022, and Final Adoption effective February 15, 2023).

90.     Infinite Supply was created in connection with an elaborate scheme to fraudulently bill No-fault insurance carriers for Rental DME that were never provided, were not provided as billed or, if provided, were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Covered Persons received the Rental DME as part of the same or similar battery of DME and/or orthotic devices.

91.     The Rental DME that Infinite Supply purported to provide, and for which it billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.  Instead, Osiashvili, through Infinite Supply, created a billing apparatus which implemented a pre-determined treatment protocol that was designed to drain the maximum amount

of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

92.     Osiashvili created and controlled Infinite Supply, which was part of a well-organized illegal enterprise that engaged in pervasive fraudulent practices that distinguished it from legitimate providers of Rental DME.  The components of the enterprise followed practices that were part of a racketeering scheme dictated by Osiashvili, including, but not limited to, one of more of the following practices:

- Unlike legitimate retail DME companies, Osiashvili, through Infinite Supply, misrepresented the nature, quality, and necessity of Rental DME purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Osiashvili, through Infinite Supply, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Osiashvili, through Infinite Supply, submitted bills to Plaintiffs for Rental DME that were never provided to Covered Persons, and/or not provided as billed;

  Unlike legitimate retail DME companies, Osiashvili, through Infinite Supply, misrepresented the wholesale costs and/or usual and customary price of the Non-Fee Schedule items purportedly supplied to Covered Persons;

- Unlike legitimate retail DME companies, Osiashvili, through Infinite Supply, submitted prescriptions to Plaintiffs for Rental DME that were no more than pre-printed template forms containing boilerplate language to conceal the lack of medical necessity for the items;

- Unlike legitimate retail DME companies, Osiashvili, through Infinite Supply, concealed the fact that the Rental DME were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Osiashvili, through Infinite Supply, arranged to have prescriptions for Rental DME delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers; and

- Unlike legitimate retail DME companies, Osiashvili, through Infinite Supply, entered into illicit relationships with the No-fault Clinic, which, in exchange for kickbacks and/or a fee, provided Infinite Supply with

prescriptions and/or referrals for Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity.

93.     In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

94.     The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Osiashvili engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their HCPs prescribed large amounts of virtually identical DME to their patient population, and/or (ii) fabricate and/or fraudulently alter/duplicate prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Submitted or caused to be submitted, on behalf of Infinite Supply, numerous fraudulent claim forms seeking payment for Rental DME that were purportedly (but not actually) provided to many Covered Persons;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

95.     At all relevant times mentioned herein, Osiashvili knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Rental DME.

96.     At all relevant times mentioned herein, Osiashvili, through Infinite Supply, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

97.　　At all relevant times mentioned herein, Osiashvili and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

**THE MECHANICS OF THE SCHEME TO DEFRAUD**

98.　　Beginning in September 2021, and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Rental DME to Covered Persons.

99.　　Osiashvili formed, owned and/or controlled Infinite Supply for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

100.　　Infinite Supply, through Osiashvili, engaged in a pervasive scheme to defraud, wherein Osiashvili: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of Rental DME; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered or duplicated; (iv) arranged for the No-fault Clinics to have assignments of benefits and/or prescription forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (v) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for Rental DME that were purportedly provided to Covered Persons based on medical necessity when, in fact, Osiashvili, through Infinite Supply, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving substantially similar Rental DME for a substantially similar timeframe.

101.    Defendants devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive rental pain management and/or postoperative rehabilitative Rental DME that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, materially misrepresented in their fraudulent bill submissions to Plaintiffs.

102.    Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements, would issue a prescription for a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary, including but not limited to prescriptions for DME.

103.    Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

104.    As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with one or more of the Retail Defendants, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to Infinite Supply by: (i) causing their HCPs to write Rental DME prescriptions in accordance with a pre-determined protocol; and/or (ii) fabricating and/or falsifying DME prescriptions by photocopying or duplicating the HCPs' signatures onto new, blank prescription forms. By way of example and not limitation, Exhibit "3" in the attached Compendium of Exhibits is a representative sample of prescription forms submitted

by the Retail Defendants wherein the HCP signatures on the prescriptions appear to be duplicated and/or photocopied.

105.    Moreover, in keeping with the fact that the Rental DME was not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the prescriptions issued by the HCPs were issued on template, pre-printed prescriptions forms that contained the same exact boilerplate language ostensibly explaining the medical necessity for the device, along with the physicians generic statement concerning the efficacy of the device.  There is, however, no discussion of any of the Covered Persons' individual needs and diagnoses, nor any explanation how the device will assist the specific Covered Person. The prescription forms contained in Exhibit "4" are also a representative sample of prescriptions with the identical, boilerplate language.

106.    In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for Rental DME.  Instead, these prescriptions were given directly to Infinite Supply to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of Rental DME.

107.    Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

108.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, Infinite Supply routinely deliberately obscured identifying information relating to the billed-for Rental so as to prevent Plaintiffs from determining the appropriate charges associated with any such Rental or whether the specific Rental DME and/or was medically necessary.

109.    As a matter of pattern, practice, and protocol, Infinite Supply routinely provided Covered Persons with expensive Compression Devices and/or Portable Ultrasound units that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals to maximize reimbursement.

110.    In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the Rental DME prescribed were not documented in the medical report of the prescribing HCPs by whom Covered Persons were treated.  To the extent that any of the medical records did identify the Rental DME purportedly prescribed, the records did not explain the medical necessity for the Rental DME, did not identity or reference all of the Rental DME listed on the prescriptions, and in some instances, identified Rental DME that was not included on the prescriptions issued by the HCPs.  On many occasions, the prescriptions for Rental DME purportedly issued by the HCPs were issued on dates that the Covered Persons did not treat with the HCPs. In addition, on many occasions, the prescriptions for Rental DME purportedly issued by the HCPs were left undated, obscuring when the prescription was issued and when legitimately prescribed DME would have been noted in the prescribing HCP's treatment notes.  By way of example and not limitation:

- On February 13, 2022, in the midst of a course of treatment at a No-Fault Clinic located at 234-51 Merrick Boulevard, Queens, NY, Covered Person M.M, claim no. 0652012899-03 presented at All City Family Healthcare Surgical Center (not named a defendant in the Complaint) for an arthroscopic procedure and thereafter, met with the surgeon on February 25, 2022, for a follow-up exam, yet neither the operative report nor the follow-up report made any prescription or recommendation for a Compression Device.   Notwithstanding, Infinite Supply submitted a bill with a prescription, dated February 13, 2022, purportedly signed by the surgeon prescribing a Compression Device.

- On March 30, 2022, in the midst of a course of treatment at a No-Fault Clinic located at 171-19 Hillside Avenue, Jamaica, NY, Covered Person M.F., claim no. 0653972786-03 presented at All City Family Healthcare

Surgical Center (not named a defendant in the Complaint) for an arthroscopic procedure and thereafter, met with the surgeon on July 9, 2022, for a follow-up exam, yet neither the operative report nor the follow-up report made any prescription or recommendation for a Compression Device. Notwithstanding, Infinite Supply submitted a bill with a prescription, dated March 30, 2022, purportedly signed by the surgeon prescribing a Compression Device.

- On August 11, 2022, Covered Person F.O., claim no. 0680607181-01 was purportedly seen by the HCP, for an initial chiropractic examination at a No-fault Clinic located at 4226 A Third Avenue, Bronx, NY, and thereafter, for the Covered Person's first chiropractic re- evaluation on December 8, 2022 and second re-evaluation on January 17, 2023, yet neither the initial examination report nor the re-evaluation reports made any prescription or recommendation for Rental DME. Notwithstanding, Infinite Supply submitted bills with a prescription dated November 22, 2022, purportedly from the HCP prescribing a Portable Ultrasound unit for a thirty-day treatment period, purportedly dispensed for dates of service December 1, 2022 through December 30, 2022.

- On December 17, 2022, Covered Person K.G., claim no. 0695296854-01 was purportedly seen by the HCP, for an initial examination at a No-fault Clinic located at 240-19 Jamaica Avenue, Bellerose, NY, and thereafter, for follow-up examinations on January 31, 2023 and March 7, 2023, yet neither the initial examination report nor the follow-up examination reports made any prescription or recommendation for Rental DME. Notwithstanding, Infinite Supply submitted bills with a prescription dated January 31, 2023, purportedly from the HCP prescribing a Portable Ultrasound unit for a thirty-day treatment period, purportedly dispensed for dates of service February 8, 2023 through March 9, 2023.

The foregoing are non-exhaustive examples of claims for Rental DME submitted to Plaintiffs by Infinite Supply, which based on the prescribing HCP's medical reports were submitted pursuant to a predetermined treatment protocol irrespective of medical necessity.

111.    Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

**FRAUDULENT BILLING OF RENTAL DME ITEMS**

112.    In furtherance of the scheme to defraud alleged herein, Infinite Supply, as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

113.    As part of the scheme, the Covered Persons receiving the expensive Rental DME items were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment.  Shortly after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture, and several pieces of DME and/or orthotic devices—in some instances, receiving up to ten (10) or more items.

114.    At the same time and/or shortly after Covered Persons purportedly receive several pieces of DME and/or orthotic devices, as part of the fraudulent protocol of treatment, the Covered Persons are prescribed a round of expensive pain management Rental DME and/or compression devices by the HCPs operating out of the No-fault Clinics, Cold Compression Devices and Portable Ultrasound units, billed for and purportedly dispensed by Infinite Supply.

115.    Moreover, months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

116.     On the same day as the surgery, and within a few short days after the surgery, the Covered Persons are prescribed additional expensive perioperative and/or postoperative rental DME and/or compression devices, as part of a pattern and protocol of treatment to maximize reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration.  In many cases, the Covered Persons receive at least four or more such items, for up to 28 days or longer, in some cases exceeding $6,000.00 in a total cost for all of the perioperative and postoperative items.  By way of example and not limitation, the following are non-exhaustive examples where Covered Persons received the same or similar battery of perioperative and/or postoperative rental DME and/or compression devices, including a Compression Devices purportedly provided by Infinite Supply and one or more additional Compression Devices purportedly provided by other DME retailers:

- In connection with claims submitted on behalf of Covered Person K.B., claim number 0653005868-02, Plaintiffs were billed for at least six pieces of rental DME and/or compression devices and related appliances purportedly provided by three different companies amounting to $6,098.85. On February 24, 2022, the same day Covered Person T.C. underwent arthroscopic shoulder surgery at an ASC, Defendant Infinite Supply, purportedly provided a Cold Compression Device for use the day of the surgery at the ASC for $604.83.  That same day, East Coast Med Group Inc (not named a defendant in the Complaint) purportedly provided a ProThermotek compression device for use the day of the surgery at the ASC for $95.50.  Starting February 25, 2022, Vital Care Group Inc (not named as a defendant in the Complaint) purportedly provided  a cold compression device for a twenty-one-day rental period for $1,575.00, and a continuous passive motion device for the shoulder for a forty-two-day rental period for the total amount of $3,824.52.

- In connection with claims submitted on behalf of Covered Person T.C., claim number 0650720931-01, Plaintiffs were billed for at least six pieces of rental DME and/or compression devices and related appliances purportedly provided by three different companies amounting to $6,196.33. On February 27, 2022, the same day Covered Person T.C. underwent arthroscopic knee surgery at an ASC, Defendant Infinite Supply, purportedly provided a Cold Compression Device for use the day of the surgery at the ASC for $604.83.  That same day, East Coast Med Group Inc

(not named a defendant in the Complaint) purportedly provided a ProThermotek compression device for use the day of the surgery at the ASC for $72.00. Starting March 7, 2022, IDM Supply Inc (not named as a defendant in the Complaint) purportedly provided a cold compression device for a twenty-eight-day rental period for $1,820.00 along with knee wrap for $110.00. Starting the same day, Eden Ortho Supply Ltd. (not named a defendant in the Complaint) purportedly provided a continuous passive motion device for the knee for a twenty-eight-day rental period, with accompanying sheepskin pad for the total amount of $3,589.50.

- In connection with claims submitted on behalf of Covered Person K.M., claim number 0653820118-01, Plaintiffs were billed for at least four pieces of rental DME and/or compression devices and related appliances purportedly provided by three different companies amounting to $4,864.93. On February 24, 2022, the same day Covered Person K.M. underwent arthroscopic knee surgery at an ASC, Defendant Infinite Supply, purportedly provided a Cold Compression Device for use the day of the surgery at the ASC for $604.83. That same day, East Coast Med Group Inc (not named a defendant in the Complaint) purportedly provided a ProThermotek compression device for use the day of the surgery at the ASC for $72.00. Starting February 25, 2022, T Ortho Services Inc (not named as a defendant in the Complaint) purportedly provided a cold compression device for a twenty-eight-day rental period for $1,960.00, a continuous passive motion device for the knee for a twenty-eight-day rental period, with accompanying sheepskin pad for the total amount of $2,118.10, and postoperative knee brace for $110.00.

117.    Such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision of inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by the Retail Defendants.  In that regard, the supply of such items was motivated by money, without regard to the actual need of the patients, for the express purpose of increasing the amount of reimbursement sought from insurers in general, and Plaintiffs in particular.

**1**.        **Fraudulent billing of Portable Ultrasound Units**

118.    In furtherance of the scheme to defraud alleged herein, Osiashvili, through Infinite Supply, routinely submitted bills to Plaintiffs for Portable Ultrasound units that were not provided

as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

119.    Each of the Covered Persons that receive Portable Ultrasound Units were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.  By way of example and not limitation, in connection with claim numbers 0680607181-01, 0689694163-02, 0689694163-07, 0695296854-01, and 0702637885-01, none of the Covered Persons were involved in major car accidents that resulted in significant injury or hospitalization.

120.    A Portable Ultrasound unit is a battery powered, wearable and portable device that purports to produce ultrasound in order to provide heat related medical therapy through the delivery of low-intensity acoustic waves for the treatment of acute and chronic tendinopathies, muscle strain or spasms, or pain associated with osteoarthritis for a two-to-six-week period.

121.    Notwithstanding the typical uses for the devices, referring HCPs routinely issue prescriptions for Portable Ultrasound units for patients that, in many instances, would undergo outpatient arthroscopic surgical procedures, were involved in minor impact accidents and suffered only minor, soft tissue injuries, to the extent the suffered any injuries at all, along with a host of other expensive DME devices, designed to upcharge insurers for tens of thousands of dollars as part of a fraudulent protocol of medically unnecessary treatments. In that regard, contemporaneously with the dispensing of the Portable Ultrasound units, the patients receive a substantial and similar battery of regular and often pain management rental DME pursuant to a fraudulent protocol established at the No-fault Clinics where the Covered Persons presented for treatment. By way of example and not limitation:

- In connection with claims submitted on behalf of Covered Person R.R., claim number 0706091204-04, Plaintiffs were billed for at thirteen pieces

of regular DME, totaling $4,675.28. On March 15, 2023, Elbrus Medical Supplies, Inc. (not named as a defendant in the Complaint) purportedly provided a bed board for $101.85, a cervical collar for $75.00, a cervical pillow for $20.04, an eggcrate mattress for $19.48, an LSO for $759.92 and, a lumbar cushion for $282.40. On May 1, 2023, Elbrus Medical Supplies, Inc purportedly provided the second LSO it purportedly provided to the Covered Person, for $1,150.00, a cervical traction unit for $502.63, and a shoulder brace for $896.92. On May 8, 2023, Elbrus Medical Supplies, Inc. also purportedly provided an EMS Unit for $276.25, an EMS placement belt for $83.79, an infrared heat lamp for $210.12, and a back massager for $295.00. Starting March 9, 2023, six days before the Covered person received their first piece of regular DME, Defendant Infinite Supply purportedly provided a Pain Shield Portable Ultrasound unit for a thirty-day rental period for $2,550.00. Ultimately, Plaintiffs were billed $7,225.28 in connection with at least fourteen pieces of regular DME and pain management rental DME.

- In connection with claims submitted on behalf of Covered Person K.B., claim number 0682920749-06, Plaintiffs were billed for at twelve pieces of regular DME, totaling $4,092.52. On October 12, 2022, Sloan Medical Supply Corp. (not named as a defendant in the Complaint) purportedly provided a bed board for $101.85, a cervical collar for $233.00, an electric heat pad for $20.93, an LSO for $741.59, a foam mattress for $155.52, and a lumbar cushion for $46.39. On November 28, 2022, Sloan Medical Supply Corp purportedly provided the second LSO it purportedly provided to the Covered Person, for $1,150.00, a cervical traction unit for $502.63, an infrared heating lamp for $368.75, a massager for $355.56, an EMS unit for $375.40, and an EMS belt for $40.90. In the interim, starting November 25, 2022, Defendant Infinite Supply purportedly provided a Pain Shield Portable Ultrasound unit for a thirty-day rental period for $2,550.00. Ultimately, Plaintiffs were billed $6,642.52 in connection with at least thirteen pieces of regular DME and pain management rental DME.

- In connection with claims submitted on behalf of Covered Person A.L.D.O., claim number 0684019284-02, Plaintiffs were billed for at 13 pieces of regular DME, totaling $5,134.39. On September 9, 2022, Sloan Medical Supply Corp. (not named as a defendant in the Complaint) purportedly provided a cervical pillow for $22.04, a cervical collar for $233.00, an electric heat pad for $20.93, an LSO for $741.59, and a lumbar cushion for $46.39. On November 3, 2022, XL Medical Supply, Inc. (not named a defendant in the complaint) purportedly provided a massager for $355.56, an EMS unit for $375.40, and an EMS belt for $40.90. On November 30, 3033, XL Medical Supply Inc. purportedly an infrared heating lamp for $368.75, a cervical traction unit for $502.63, the second LSO purportedly provided to the Covered Person, for $1,150.00, a shoulder brace for $690.23, and a knee brace for $607.55. In the interim, starting November 29, 2022, Defendant Infinite Supply purportedly provided a Pain Shield

Portable Ultrasound unit for a thirty-day rental period for $2,550.00. Ultimately, Plaintiffs were billed $7,684.39 in connection with at least thirteen pieces of regular DME and pain management rental DME.

122.    The heating pattern of the Portable Ultrasound unit is circumscribed and not useful for large areas of tissues such as prescribed by the referring HCP.  For example, the ultrasound purportedly provided by the Portable Ultrasound unit only heats the tissue directly below the transducer, making it impractical for heating large areas such as trapezius muscles and cervical or lumbosacral paraspinal muscles.

123.    In keeping with the facts that the Portable Ultrasound units purportedly provided by Cool Med were medically unnecessary, Covered Persons purportedly receiving the devices were, at the same time, undergoing a protocol of physical therapy treatment at the No-fault Clinics, obviating the need for at-home ultrasound therapy.

124.    The prescriptions for the Portable Ultrasound units are never given to the patients. Instead, the prescriptions are sent from many of the same referring medical clinics directly to a predetermined Rental DME provider in exchange for a kickback and/or other financial incentive or compensation.

125.    In numerous cases, the prescriptions from the referring providers are fabrications as part of the scheme to maximize reimbursement through these medically unnecessary rental items and the Portable Ultrasound units in particular.

126.    Upon receipt of the prescriptions for the Portable Ultrasound units, Infinite Supply routinely submits bills to insurers for rental periods spanning two (2) to four (4) weeks regardless of actual patient need in order to maximize reimbursement.

127.    Moreover, Infinite Supply routinely separated each thirty (30) day rental into two bills, each for fifteen (15) days of the full rental period, to conceal from insurers the true length and total accumulated rental cost of the billed for Portable Ultrasound units.

128.    On information and belief, the devices are delivered to the patients without the patients' knowledge that they were going to receive the device.  Upon delivery, proper instruction on the use of the device and the risks associated with the device are not explained to the patients. In many cases and as a result, the patients do not use the device and/or use the device improperly posing a risk to the patients' health as well rendering the device ineffective.

129.    By way of example and not limitation, Osiashvili, through Infinite Supply, routinely submitted bills to Plaintiffs for Portable Ultrasound units under code K1004 in amounts up to and including $2,550.00, which were not provided as billed, if any were provided at all, and were supplied pursuant to a fraudulent protocol of treatment. Exhibit "5" in the accompanying Compendium of Exhibits is a representative sample of claims submitted through Infinite Supply to Plaintiffs where Retailer Defendant submitted fraudulent bills for Portable Ultrasound units under code K1004.

130.    To the extent the Portable Ultrasound devices were purportedly provided to Covered Persons on a rental basis Osiashvili, through Infinite Supply billed Plaintiffs far in excess of that permissible under the Fee Schedule.

**2.      Fraudulent billing for Compression Devices**

131.    In furtherance of the scheme to defraud alleged herein, Osiashvili, through Infinite Supply, routinely submitted bills to Plaintiffs for pneumatic and/or cold compression devices ("Compression Devices") devices that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

132.    Each of the Covered Persons that receive Compression Devices were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.  By way of example and not limitation, in connection with claim numbers

0645268947-01, 0652012899-03, 0654852771-01, 0661643980-01, and 0663807865-01 none of the Covered Persons were involved in major car accidents that resulted in significant injury or hospitalization.

133.    Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and basic DME.  Indeed, with respect to DME, prior to dispensing the Compression Devices, the patients have already received a substantial and similar battery of regular and rental DME pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription.  By way of example and not limitation:

- In connection with claims submitted on behalf of Covered Person S.B., claim number 0645268947-01, Plaintiffs were billed for at least eighteen pieces of regular DME, all totaling $3,526.73. On October 20, 2021, Lumax, Inc. (not named as a defendant in the Complaint) purportedly provided a bed board for $51.70, a water circulating pad with pump for $239.99, and an ankle brace for $125.00. On October 26, 2021, Lumax, Inc. also purportedly provided a cervical collar for $233.00, a cervical pillow for $20.04, an eggcrate mattress for $153.13, an LSO for $322.98, a lumbar cushion for $55.29, an electric heat pad for $20.93, and a hot/cold pack for $5.40. four weeks later, Lumax, Inc also purportedly provided an EMS Unit for $208.50, an EMS placement belt for $15.15, an infrared heat lamp for $146.97, a back massager for $128.32, a whirlpool for $340.50, and a shoulder brace for $111.07. On January 19, 2022, Lumax, Inc also purportedly provided a second LSO for $844.13, and a cervical traction unit for $502.63. In the interim, Plaintiffs were billed for at least two pieces of pain management rental DME, totaling $3,801.56. Starting T. Ortho Services Inc (not named a defendant in the Complaint) purportedly provided a Sustained Acoustic Medicine device for a twenty-eight-day rental period for $1,841.56, and a cold compression device for a twenty-eight-day rental period for $1,960.00.  Thereafter, Plaintiffs were billed for at least five pieces of perioperative and/or postoperative rental DME and/or compression devices and related appliances purportedly provided by three different companies, amounting to $4,551.33 in total charges.  On February 19, 2022, the same day Covered Person S.B. underwent arthroscopic

shoulder surgery at an ASC, Defendant Infinite Supply, purportedly provided a Cold Compression Device for use the day of the surgery at the ASC for $604.83. That same day, East Coast Med Group Inc (not named a defendant in the Complaint) purportedly provided a ProThermotek compression device for use the day of the surgery at the ASC for $72.00. Starting 8 days later, on February 27, 2022, Van Loon DME USA Inc. (not named as a defendant in the Complaint) purportedly provided a Shoulder CPM device for a twenty-five-day rental period for the total amount of $2,449.75, with accompanying pad for $19.50, and a pneumatic compression device for a twenty-five-day rental period for the total amount of $1,424.75. Ultimately, Plaintiffs were billed for $11,879.62 in connection with at least twenty-five pieces of DME.

- In connection with claims submitted on behalf of Covered Person A.E., claim number 0654852771-01, Plaintiffs were billed for at least twelve pieces of regular DME provided by three different companies amounting to $4,836.13. On January 18, 2022, PAL Medical Supplies Inc (not named as a defendant in the Complaint) purportedly provided a cervical pillow for $22.04, a cervical collar for $233.00, a bed board for $101.85, an eggcrate mattress pad for $153.13, an electric heat pad for $20.93, a lumbar cushion for $282.40, an LSO for $759.92, a knee brace for $208.13, a wrist brace for $157.10, and a massager for $295.00. On February 9, 2022, Plex Health Inc. (not named a defendant in the Complaint) purportedly provided a cervical traction unit for $502.63. On March 14, 2022, Ortho Light Supply Inc (not named a defendant in the Complaint) purportedly provided a Triad 3LT low light therapy device for $2100.00. Along with the aforementioned regular DME, Plaintiffs were billed for a piece of pain management rental DME, specifically, a pulsed laser therapy device purportedly provided by Plex Health Inc, for a twenty-eight-day rental period, starting January 27, 2022, for $1,680.00. Thereafter, Plaintiffs were also billed for at least six pieces of perioperative and/or postoperative rental DME and related appliances purportedly provided by three different companies amounting to $5,940.23. On April 10, 2022, the same day Covered Person S.B. underwent arthroscopic knee surgery at an ASC, Defendant Infinite Supply, purportedly provided a Cold Compression Device for use the day of the surgery at the ASC for $604.83. That same day, East Coast Med Group Inc (not named a defendant in the Complaint) purportedly provided a ProThermotek compression device for use the day of the surgery at the ASC for $100.00. Starting ten days later on April 20, 2022, Advanced Life Services Inc. (not named as a defendant in the Complaint) purportedly provided a cold compression device for a twenty-eight-day rental period for the total of $1,958.00, along with knee brace for $110.00, a continuous passive motion device for the knee for a forty-two-day rental period for the total of $3,147.90, along with sheepskin pad for $19.50. Plaintiffs were billed for $12,456.36 in connection with at least nineteen pieces of DME.

- In connection with claims submitted on behalf of Covered Person K.D.J., claim number 0655711067-01, Plaintiffs were billed for at least nineteen pieces of regular DME amounting to $$3,491.38. On January 27, 2022, Flotus Inc (not named as a defendant in the Complaint) purportedly provided a hot/cold pack for $5.40, an eggcrate mattress pad for $153.13, a cervical pillow for $22.04, an electric heat pad for $20.93, a lumbar cushion for $55.29, a second lumbar cushion for $107.95, a cervical collar for $233.00, an LSO for $322.98, and a knee brace for $110.00. A week later, on February 4, 2022, Flotus Inc also purportedly provided a bed board for $68.48, a water circulating pad with pump for $210.63, a second knee brace for $110.00, a shoulder brace for $111.07, and an elbow brace for $221.18, and a wrist brace for $168.86. On February 18, 2022, Flotus Inc. also purportedly provided a second shoulder brace, for $690.23. On March 3, 2022, Flotus Inc purportedly provided an infrared heat lamp for $228.60, a TENS unit for $239.92 and a whirlpool for $411.69. Later, on June 14, 2022, Flotus Inc purportedly provided second LSO for $844.22. On June 20, 2022, Flotus Inc. purportedly provided a cervical traction unit for $502.63.Plaintiffs were also billed for at least five pieces of perioperative and/or postoperative rental DME and related appliances purportedly provided by three different companies amounting to $$6,430.13. On April 22, 2022, the same day Covered Person N.H. underwent arthroscopic shoulder surgery at an ASC, Defendant Infinite Supply, purportedly provided a Cold Compression Device for use the day of the surgery at the ASC for $604.83. That same day, East Coast Med Group Inc (not named a defendant in the Complaint) purportedly provided a ProThermotek compression device for use the day of the surgery at the ASC for $94.50. Starting May 3, 2022, Van Loon DME USA Inc. (not named as a defendant in the Complaint) purportedly provided a Shoulder CPM device for a forty-two-day rental period for the total amount of $4,115.58, with accompanying pad for $19.50, and a pneumatic compression device for a twenty-eight-day rental period for the total amount of $1,595.72. On Loon DME USA Inc also purportedly provided a shoulder support on May 3, 2022. Plaintiffs were billed for at least $11,379.34 in connection with at least twenty-five pieces of DME.

134. After the initial round of unnecessary treatment, upon a follow up visit with the No-fault Clinics, in most cases, the patients are referred for surgical procedures performed at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.

135. After the surgery at the ASC, the Covered Persons are purportedly provided with Compression Devices post-surgery, along with several other pieces of rental DME.

136.    A Compression Device consists of an air pump and an inflatable jacket that encloses the limb requiring treatment. The pump fills the jacket with compressed air to predetermined pressures and intermittently alternates inflation and deflation to preset cycle times. There are three primary types of compression devices. A non-segmented pneumatic compressor, which was billed for by the Defendants, is a device that consists of a single chamber that is inflated at one time and that applies uniform pressure. A cold compression device, which was also billed for by Defendants, operates similarly but simultaneously applies cold therapy to the affected area of the patient.

137.    A Compression Device is used to improve venous circulation in the limbs of a patient suffering from edema, or the risk of deep vein thrombosis (DVT) or pulmonary embolism. The primary purpose of the device is to ensure movement of venous blood by pressurizing the tissues in the limb, thereby forcing fluids, such as blood and lymph out of the pressurized area. The pressure is later reduced, allowing for increased blood flow back into the limb.

138.    The use of Compression Devices is rarely indicated in the types of procedures performed on the Covered Person to prevent limb edema.  In almost all cases, the prevention and/or alleviation of post-surgical edema can be done simply by using simple cold packs, compressive bandages, and elevation of the limb.

139.    The standard of care in the prevention of DVT is anticoagulation medication unless it is contraindicated.

140.    Infinite Supply, as a matter of pattern, practice and protocol, billed for medically unnecessary Compression Devices purportedly supplied on the same day as the surgery at ASCs. In many instances, the same Covered Persons were purportedly provided similar Compression

Devices to that billed for at the ASC, within a few days of the surgery on a rental basis for periods of 14 to 28 Days.

141.    By way of example and not limitation, in connection with claim numbers 0645268947-01,     0652012899-03,     0653820118-01,     0654852771-01,     0655109536-04, 0655143543-0, 0655711067-01, and 0663807865-01, Infinite Supply billed for Compression Devices provided on the day of surgery, at the ASC for the same Covered Persons that other DME retailers not named as defendants in the Complaint billed for  substantially similar Compression Devices within a few days of the surgery, on a rental basis for periods of 14 to 28 days.

142.    The Compression Devices supplied by Infinite Supply were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply insureds with excessive and unnecessary rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

143.    As part of Defendants' scheme to bill in excessive amounts beyond what it was entitled to be reimbursed under the No-Fault Law, Infinite Supply used the "NU" modifier on its bills, falsely representing to Plaintiffs that the Compression Devices were being sold to Covered Persons rather than rented for a single day's use at the ASC.

144.    On information and belief, Covered Persons purportedly receiving Compression Devices from Infinite Supply, would undergo a compression treatment during the surgery or immediately following the surgery in the recovery room, and then leave the Compression Device purportedly provided by Infinite Supply at the ASC for use by the next surgical patient.

145.    The prescription forms purportedly signed by the HCPs and submitted by Infinite Supply to Plaintiffs indicate the length of need as a single unit and sets forth a single date of

service matching the date of the Covered Person's surgery, but does not set forth a range of time following the surgery in which the Covered Person should use the device.

146. In addition, as set for above, assuming Compression Devices for home use were medically necessary, which they are not, Covered Persons nonetheless purportedly received substantially similar Compression Devices for home use, not from Infinite Supply, but from one or more other DME retailers for rental periods ranging from fourteen (14) to twenty-eight (28) days.

147. In misrepresenting that the Compression Devices purportedly provided by Infinite Supply were sold rather than rented for a single day, Infinite Supply billed Plaintiffs far in excess of what would have been permissible for a single day rental for a Compression Device billed under code E0676.

148. By way of example and not limitation, Exhibit "6" in the accompanying Compendium of Exhibits is a representative sample of claims where Infinite Supply submitted fraudulent bills to Plaintiffs for Compression Devices billed under code E0676 in the amount of $604.83.

## DISCOVERY OF THE FRAUD

149. To induce Plaintiffs to promptly reimburse their claims for Rental DME, Defendants have gone to great lengths to systematically conceal their fraud. By way of example and not limitation:

- Osiashvili, through Infinite Supply, routinely and deliberately submitted claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Osiashvili, through Infinite Supply, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Osiashvili, through Infinite Supply, knowingly misrepresented and concealed that Infinite Supply's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement; and/or

- Osiashvili, through Infinite Supply, knowingly and deliberately concealed the amounts Infinite Supply was entitled to be reimbursed in the bills submitted to Plaintiffs by misrepresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the applicable DME Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

150.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $45,000.00 based upon the fraudulent bill submissions.

151.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

### FIRST CLAIM FOR RELIEF

### AGAINST DEFENDANT OSIASHVILI, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C. § 1962(c))

152.    The allegations of paragraphs 1 through 151 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

153.    At all times relevant herein, Infinite Supply Group Inc. was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

154.    From, on or about September 24, 2021, through the date of the filing of this Complaint, Defendants Osiashvili, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the Infinite Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

155.    At all relevant times mentioned herein, Defendant Osiashvili, together with others unknown to Plaintiff, exerted control over and directed the operations of the Infinite Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the utilization of fraudulent prescriptions.

156.    One or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation, that grossly inflated the purported cost and/or necessity of the DME to facilitate the fraudulent billing alleged in the Complaint.  One or more

of the ABC Corporations furnished documents that Defendant Osiashvili required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent Rental DME claims.

157.    It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

158.    The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendant Osiashvili, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 to fraudulently bill for Rental DME to defraud insurers, and, if not stopped, such acts will continue into the future.

159.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Infinite Supply continues to pursue collection on the fraudulent billing to the present day.

160.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Osiashvili, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Infinite Supply enterprise based upon materially false and misleading information.

161.    Through the Infinite Supply enterprise, Defendant Osiashvili submitted numerous fraudulent claim forms seeking payment for Rental DME that were purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Osiashvili, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Osiashvili, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Infinite Supply enterprise through the filing of this Complaint.

162.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Osiashvili in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

163.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

164.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

165.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $45,000.00, the exact amount to be determined at trial.

166.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Osiashvili, one or more of the ABC Corporations 1 through 5 and one or more of the John Does

1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS INFINITE SUPPLY, AND OSIASHVILI

### (Common Law Fraud)

167.    The allegations of paragraphs 1 through 151 are hereby repeated and realleged as though fully set forth herein.

168.    Defendants Infinite Supply and Osiashvili made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

169.    Each and every bill and supporting documentation submitted by Defendants Infinite Supply and Osiashvili to Plaintiffs set forth false and fraudulent amounts for reimbursement for Rental DME that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public.

170.    Defendants Infinite Supply and Osiashvili intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and necessity of the DME purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts Infinite Supply was entitled to be reimbursed under the No-fault Law;

- With respect to rented DME, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the Covered Persons; (b) not billed in excess of the

maximum permissible monthly rental charge or maximum accumulated rental charge for such equipment, supplies and services provided on a rental basis under the applicable Fee Schedule; (c) not billed in excess of the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service prior to April 4, 2022; and/or (d) not billed in excess of the lesser of the providers' acquisition cost plus 50% or the usual and customary price charged by durable medical equipment providers to the general public if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service after April 4, 2022; and/or

- False and misleading prescriptions for DME, concealing the fact that the (a) DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Defendant Osiashvili, through Infinite Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME; (b) DME was not covered by the applicable DME Fee Schedule; and/or (c) the prescriptions were fabricated and/or fraudulently altered and/or duplicated.

171.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Infinite Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

172.    Defendants Infinite Supply and Osiashvili knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

173.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Infinite Supply and Osiashvili.

174.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid Defendant Infinite Supply's claims for No-fault insurance benefits submitted in connection therewith.

175.     Furthermore, the far-reaching pattern of fraudulent conduct by Defendants Infinite Supply and Osiashvili evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

176.     By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined but believed to be in excess of $45,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

### THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANTS INFINITE SUPPLY AND OSIASHVILI

### (Unjust Enrichment)

177.     The allegations of paragraphs 1 through 151 are hereby repeated and realleged as though fully set forth herein.

178.     By reason of their wrongdoing, Defendants Infinite Supply and Osiashvili have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

179.     Plaintiffs are therefore entitled to restitution from Defendants Infinite Supply and Osiashvili in the amount by which it has been unjustly enriched.

180.     By reason of the foregoing, Plaintiffs and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $45,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

**FOURTH CLAIM FOR RELIEF**

**AGAINST THE RETAIL DEFENANTS**

**(Declaratory Judgment under 28 U.S.C. § 2201)**

181.    The allegations of paragraphs 1 through 151 are hereby repeated and realleged as though fully set forth herein.

182.    At all relevant times mentioned herein, each and every bill mailed by Osiashvili, through Infinite Supply, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and effective DME Fee Schedule by materially misrepresenting the DME provided, if provided at all, as well as the cost and quality of the billed for Rental DME.

183.    To the extent the Rental DME were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

184.    At all times relevant herein, the Retail Defendants exploited the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the amounts the Defendants were entitled to be reimbursed, as well as the medical necessity of the items purportedly provided to Covered Persons.

185.    In view of the Retail Defendants' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendants have no right to receive payment for any pending bills it has submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and

- • The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for Rental DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

186.   As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the Rental DME purportedly supplied to Covered Persons and the amounts it was entitled to be reimbursed, in order to manipulate the payment formulas under the No-fault Law and effective DME Fee Schedules in its claims submissions, obtain reimbursement far in excess of the maximum permissible charges it was entitled to receive for medically unnecessary items provided pursuant to a fraudulent protocol of treatment, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of the Retail Defendants' No-fault claims.

187.   Plaintiffs have no adequate remedy at law.

188.   The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)   Compensatory damages in an amount in excess of $45,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)   Punitive damages in such amount as the Court deems just;

iii)      Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

iv)      Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)      Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)      Declaratory relief on the Fourth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (2) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for Rental DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii)      Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
      March 13, 2024

             Morrison Mahoney LLP

             By:  /s/ Lee Pinzow
                Robert A. Stern, Esq.
                James McKenney, Esq.
                Lee Pinzow, Esq.
                Attorneys for Plaintiffs
                Wall Street Plaza
                88 Pine Street, Suite 1900
                New York, New York 10005
                (212) 825-1212

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>                               **Plaintiffs,**<br><br>    **-against-**<br><br><br>INFINITE SUPPLY GROUP INC., MIKAEL OSIASHVILI, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>                              **Defendants.** | CIVIL ACTION<br><br>24-CV-1860<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

# COMPLAINT

MORRISON MAHONEY, LLP
ATTORNEYS FOR PLAINTIFFS
WALL STREET PLAZA
88 PINE STREET, SUITE 1900
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 825-1212